Case number 23-1769, Christian Healthcare Centers v. Dana Nessel et al. Oral argument is not to exceed 15 minutes per side. Mr. Neihardt, you may proceed for the appellant. Good afternoon. My name is Brian Neihardt. I represent Christian Healthcare Centers. I have reserved 5 minutes for rebuttal. May it please the court. Yes, thank you. The district court dismissed Christian Healthcare's complaint based on a theory of standing that would improperly restrict pre-enforcement actions by plaintiffs of all views. Consider a law that bans employers from engaging in diversity, equity, and inclusion training. The law contains a vague exemption, just like Michigan's laws, that prohibits such training except where otherwise permitted by law. Suppose further that the government had only ever previously prosecuted a law firm for engaging in training on advancing women in business. Under the district court's logic, a technology company that wanted to train its employees on implicit racial bias would lack pre-enforcement standing to challenge that law. The except where permitted by law language would negate the company's credible threat of enforcement under the district court's view, and the law firm wouldn't be a proper comparator to the technology company because law firms are different than technology companies. So the technology company would face a choice, engage in the training and risk violating the law or forego the training altogether. Michigan's laws put Christian Healthcare to a similar choice. It can engage in its religiously motivated activities at the risk of invasive investigations and burdensome administrative proceedings, or it can refrain from those religiously motivated activities in violation of its religious mission. Can I ask you just a... It's not obvious to me the relationship between arguably prohibited, so arguably the adverb, is what is necessary for standing. And then, at least in some of the briefs I've read, I can't remember if it was in Christian Health in particular, the idea is that actually prohibited is a merits question. And I'm just trying to figure out how that works. So assume we think it's arguably prohibited, but then it's just a question of statutory interpretation, which we would look to the Michigan Supreme Court, but if they have no guidance we have to give our best guess. If we found that it wasn't prohibited, what's the judgment? So that would be a merits judgment, but it would be technically for the defendant, but it would help you? Because it's made clear that your conduct isn't covered by this? How does that work? Yes, Judge Murphy, I think the way that that would work is, Michigan has said that Christian Health Care's conduct is not under... I think that shows why the district court confused the merits and standing. I think whether the conduct is actually prescribed by the law or not depends on how the First Amendment applies in this case. And so Christian Health Care has laid out in its brief the reasons why we think that the law should not apply in particular situations of pronoun usage, cross-sex hormone policies, and employment decisions. But you're saying your claims are that the law violates the First Amendment. That's correct. And I agree with you, under the government's view, the law actually incorporates the First Amendment in accordance with law language. So it seems like we would never get to the First Amendment question. We might get to it in effect via the statute, but the judgment would be that the statute doesn't cover your conduct. Right, Judge Murphy, and I think to reach that conclusion, you would also have to conclude that the First Amendment allows an exemption for Christian Health Care. And I think part of the, and this I think goes to the failure to disavow of Michigan, is that we don't know exactly how it will interpret its law and whether it's consistent with the First Amendment or not. And, in fact, in prior briefing, in the Roushwell decision, for example, on page ID number 695 to 697, Michigan said that ELCRA is a law that is neutral and generally applicable, and it also said that this law would pass strict scrutiny. So that's an obvious basis where there's disagreement on the First Amendment principles, which is what needs to be resolved, and it shows that it's a legal conclusion that this court is fit to resolve because it's a constitutional First Amendment issue. So just, I'm sorry, but I'm just confused about the process. So I agree with you that the First Amendment could be baked into the statute, but so why didn't you argue in your complaint in the alternative? Either the First Amendment, either the statute covers our conduct and it's thereby unconstitutional under the First Amendment, or alternatively grant us an injunction that the statute doesn't cover our conduct. That seems to be what would be the effect of our ruling under the government's position, but who would win in that scenario? We would dismiss your claim saying there's no First Amendment problem because the statute doesn't cover your conduct? Well, again, Your Honor, I think that in that situation you would have to rule on the merits of the First Amendment claim because Michigan's only argument is that the except where permitted by law language encompasses the First Amendment, and so therefore it might not apply. So that's where they go together. I would also say, too, is that this situation is common in First Amendment pre-enforcement cases where whether a statute specifically has some sort of written exemption or not, all laws have to comply with the First Amendment. And so it would be no different from the 303 Creative case, for example, where the Supreme Court found that the website designer had standing and then Colorado could not apply its law to the website designer because of the First Amendment. And, in fact, Colorado's regulations had a provision that said that its law was required to be applied in a way consistent with federal law. And that's the except where permitted by law provision. There's also the BFOQ provision, which Michigan relies on to say that Christian health care lacks a credible threat. But going through that process imposes two separate independent harms. The first one is that it violates Christian health care's religious autonomy to be subject to those types of inquiries. And then, second, there's practical harms associated with going through the exemption process. So for the religious autonomy doctrine, the BFOQ process allows Michigan to make case-by-case determinations about whether each position at Christian health care is sufficiently religious to warrant an exemption, which is a violation of the church autonomy doctrine because it involves entanglement issues. Let me ask you about the basis when you delve into the applicable law regarding standing. You argue that there's a presumption that applies to a credible threat of enforcement. And you say this is both for facial and as applied challenges. But you cite us then to cases basically from the 1980s and the 1990s. And you do not apply the McKay factors. Where in our law do you find that this presumption applies and is at odds with our consistent application of the McKay factors? Your Honor, I think in an as applied context, Holder v. Humanitarian Law Project supports that presumption. In that case, there are several enforcement cases, and the government refused to disavow. But I also think, and we argue this in our briefs, that we easily meet the McKay factors as well. The McKay factors, as this Court has made clear, is a non-exhaustive and non-exclusive list of factors that apply. And if I can just tick through them quickly. First, as to disavow, Michigan has said that disavow is impossible in this context. And, Judge Murphy, this goes back to our conversation earlier. Second, Michigan has conceded that its law contains statutory attributes that make it easy to enforce. In fact, on page ID number 759 of its motion to dismiss reply, Michigan wrote, Plaintiff can only meet one of the four McKay factors, that being that the statute provides for public enforcement. We said in our complaint, page ID 44, that Michigan has investigated thousands of complaints against employers and public accommodations. And then, as to the direct letter of enforcement, Michigan has not sent a direct letter to Christian Health Care. But it has made several public, many public statements about its desire to enforce the law, including in press releases, amicus briefs, press conferences, and in the Roushville litigation itself. And this- Has it made any, so you've said that generically, has it made any comments like that, specifically with respect to the activities that you say are protected? So that would be, I guess if you, it depends on how you look at it, but the accommodation provision that misuse of pronouns can violate the public accommodations provision. Has it, I know you cite AG amicus briefs in other states, but has the commission itself taken a position on that? Yes, Your Honor, in two, well, I'll cite four different situations where this has occurred, two for the accommodations clause and two for the employment clause. In uprooted electrolysis, Michigan wrote, and that was a case where there was religious objection to participating in a medical procedure involved in a gender transition. Michigan wrote this on page 680 and 682. Plaintiff's complaint, meaning uprooted electrolysis, indicates that they would not participate in assisting a transition from male to female. Clearly, plaintiff's denial of public accommodations was in part because of sex. So they're refusing to participate in a gender transition based on religious beliefs violates ELCRA. Second case is Studio 8. Michigan is currently prosecuting the salon owner for posting social media posts, explaining her position on pronouns and a statement that there are two genders. That's an ongoing prosecution now, and that was enforced based solely on the social media posts, getting to the statutory attribute prong of McKay, showing that it's easy to enforce this law. What of these cases that you're discussing are before or after your filing of the complaint? Uprooted electrolysis was before. Studio 8 is after, but we think it's appropriate to consider that because credible threat looks to the predictive nature of the government's actions and the fact that the government is currently prosecuting public accommodation for saying things that Christian Health Care wants to say is consistent with a credible threat enforcement. The two other employment cases that I would point to, Judge Murphy, are Spring Arbor University and Huda Islamic School. That's on page 976 and 977. In those cases, religious schools asked for religious BFOQs, and Michigan denied their request for BFOQs for janitors, front office staff, and other personnel. And those are the exact types of positions that Christian Health Care think are covered by the Free Exercise Clause and by the Religious Autonomy Doctrine. And, Judge Murphy, going back to your original question about the arguably prohibited and arguably prescribed and actually prohibited inquiry, that's another situation where Michigan has taken a much narrower view of the Religious Autonomy Doctrine and how the ministerial exception applies to say that religious organizations can only... to understand where these fit in the argument that you're making, because you're talking about a denial of a request for a bona fide qualification, but isn't the issue here that you have refused to make that request and refused to avail yourself of the opportunity under the statute to request a ruling from the commission? Why isn't that something that you are... it is incumbent upon you to undertake? I would refer this Court to Stefel. In that case, the Supreme Court said that it's not necessary for a 1983 plaintiff to exhaust state administrative remedies before proceeding to court, but also the BFOQ process itself poses a constitutional harm in that it allows Michigan to go on a case-by-case basis of which positions are sufficiently religious or not. Well, how can they not need that opportunity in the light of the way this statute works? Many of the cases that you cite, or the older cases particularly, are targeted, very targeted statutory provisions. The Universal Life Church, the Neighbors case, the Block case, the law targeting alcohol, both of those had a known and recognized small group of entities that it is clear that they're covered, but this statute does not partake of that. This is a broad-based statute that's applicable to a very large number of entities, and people. So isn't there a distinction there between a targeted act in which it's pretty simple to figure out whether you're covered or not, and an act like this in which, because of its breadth, it gives you opportunities to, in fact, find out whether you're covered or not covered, and you refuse to do so. Why doesn't that play into the standing analysis here? Judge Strantz, I agree that the breadth of the statute does play into the standing analysis, and it cuts against Michigan because broad laws necessarily apply in more situations than narrow laws. But to your specific question about the specificity, Michigan's law applies to all employers. Christian Health Care is an employer. Michigan admits that on page 20 to 21 of its brief. So the law clearly applies to Christian Health Care, and its law prohibits any types of distinctions amongst employment decisions, and it also prohibits Christian Health Care from making any types of inquiry into prospective applicants' religious belief. That's very clear on the statute. And those are the types of things that Christian Health Care wants to do, to be able to fulfill its religious mission with people who follow and agree with and abide by its religious views. But isn't that somewhat the essence of standing? Under your argument, anyone could stand before this court and say, we know this law applies to us. There are these targeted cases where they assumed application or where it was clear that there was a presumption of enforceability, but we're not going to look at those because we're not in that category, but we refuse to avail ourselves of the opportunities created by that statute in order to determine whether we're covered or not. How does that not expand standing to anyone who wants to stand before a court and assume that they're going to be covered? I have two responses, Judge Strange. The first one is that if an entity is obviously not covered by the law, then the burden is on Michigan to specifically disavow, and it's said here that disavow is impossible. Now, how is the burden on Michigan? Is the burden on Michigan to go through all of your pleadings and say, you raise things you want to say, you raise ten statements that you want to say, and is it your position at law that the burden then falls on Michigan that they have to sort through the expanse of your pleadings and the particular claims that you want to make and decide thumbs up on this one, thumbs down on that one? Well, Your Honor, we've been very specific in what we'd like to do, and if you look at page IDs 116, 119, 126, we've outlined the very specific policies that Christian Healthcare has and the statements that it wants to post. Michigan has not once asked for clarification. In fact, on page 11 of its brief, it details exactly what Christian Healthcare wants to do. So there's no question. Is it their job to ask you to clarify, or is it your job to go to them and say, here is what we want to say. We want either a BFOQ, we want that, or we want to move you to give us a preliminary decision. No, it's not the plaintiff's burden. In doing so, it would affect its constitutional rights, and that's the problem with the BFOQ, is that it allows Michigan to invade the decisions that Christian Healthcare makes regarding employment. And if you look at the BFOQ application itself, this is on page ID 703 to 704, it would require Christian Healthcare to hire an attorney to draft a legal brief to answer 13 specific questions about each of its employment positions. So at core, your argument is, if the statute itself has ways that you can avail yourself, your client can avail itself of information as to coverage, that because you are claiming a constitutional right, Michigan is barred from acting on those because you say, you can't make me ask for an exemption specifically. You can't make me move the commission to make a decision. Because what that does is it undercuts the option that the statute created in order for you to be able to find out what coverage means. Right? Well, I think there's a couple of limits. I would say also that the very constitutional nature of our argument would preclude lots of employers from saying that they're standing because of the BFOQ process. But it's like, for example, if a city passed a law that prohibited door-to-door solicitation, unless you previously asked the government for permission to do that, Jehovah's Witnesses who wanted to go door-to-door to proselytize wouldn't have to refrain from their constitutionally protected activities to ask for permission for something that they might have a constitutionally protected right to do. And the BFOQ process itself is also, as a practical concern, limiting. It has to be renewed every five years. Michigan can prospectively revoke. What about the request for preliminary ruling? The statutory provision that you can go in and request information, not BFOQ but in its entirety? Right, kind of the declaratory ruling type of situation. Yeah, I think there's a couple of problems with that. The first one is that Michigan can, again, always revoke that prospectively. So it's not binding prospectively. So it doesn't provide Christian Health Care with a relief, an injunction, saying that the law can't be applied to it in the constitutional way it would provide. But again, going back to STEFL, FEC versus Cruz, lots of other cases have held that if there's a process that would infringe on the constitutional rights of a plaintiff, that the plaintiff need not go through that process in order to avail itself of the courthouse doors. That's helpful to understand your position. I think your time's up. Thank you. You'll have your rebuttal. Good afternoon, Your Honors. Assistant Attorney General Kim Penderick appearing on behalf of the State Defendants. I want to do a little bit of an introduction as to the weight of this case, and then I'd like to address some of the questions that the Court has already asked. This case has very important elements to it. Religious entities have religious freedoms, and the state has an interest in eradicating discrimination. And the appellants appear to think there's a crossroads here between those two very important interests of the parties. But right now, before this Court, there's no threat of enforcement. There's been no action taken against the appellants in this case. It is merely hypotheticals. It is a broad-reaching request that they should have some type of superimmunity, that they can't even be subject to an inquiry. And I haven't seen any authority for that. I haven't seen that a church, if they have a question about lawful action, unlawful action, or someone's filed a complaint against them, that the Michigan Department of Civil Rights can't inquire regarding the circumstance. If you look at the cases... It's not that they can't inquire. It's just that the inquiry is itself an injury that could create standing, isn't it? That's their point. The inquiry is just a kind word for investigation, I would say. And the investigation. Wouldn't you concede that an investigation itself would be an Article III injury? I would not concede that an investigation... So having to respond... So you don't consider discovery an Article III injury? No, I don't consider discovery... Okay, well, assume I disagree with you. How does that affect your case? I would think that that would suggest if there's a threat of even an investigation, that that would be sufficient. Well, I guess I'll kind of talk about the religious exemptions and how they apply to the Michigan Department of Civil Rights Act. Because that might... It kind of affects the disavowal argument here also. But what happens... A religious entity, it can't engage in all form of discrimination and not be subjected to the Act. They have indicated, and we have indicated, that they are subject to the Elliott Larson Civil Rights Act unless they have a constitutional religious freedom that exempts them from it. So for the Michigan Department of Civil Rights to determine whether their behavior, or what they did, or what they have a complaint regarding them on, is they have to inquire. They have to ask, like if it's an employment decision, they have to find out, what is this position? What are their job duties? Otherwise, they can't determine whether their religious exemption applies or not. So it's because of the Act's application in some circumstances with the appellants and non-application in other circumstances, there has to be an inquiry for them to determine whether actionable discrimination has occurred or whether they're exempt. So the Act has... I agree with you. I was concerned initially by the breadth of the complaints. I think your point is that there's lots of different employees. But there are some specifics in the complaints about what they want to undertake. Does the Commission have an official position? We talked about pronoun usage. Would that violate the public accommodation provision? The Commission is taking no position on pronoun use or gender transitioning therapy. So why? So you don't disavow that it is covered? I would indicate that that's a question for the state authorities to take when they have an actual fact pattern before them. But this is the fact pattern. It's perspective. It's a deck action. They say that they want to use pronouns associated with biological sex, and their question is whether that violates the accommodations provision. And I think the distinction we're looking for the court to make is... So the courts have a duty to interpret the law, but before the courts do that, executive branch officials also have a duty to interpret the law when enforcing the statute. And I'm just curious. It sounds like you have... The briefing has been entirely opaque, except at the highest level of generality that it incorporates First Amendment protections. So I agree that you have conceded that. But it's been opaque about how the Commission will actually enforce the statute with respect to the specifics that are in the complaint. And that's why I think there's a standing issue here. Because for this, I understand the appellants want some information as to their activities and what would be protected under the Constitution. But if they don't have a fact pattern, like they haven't given the MDCR a fact pattern, but then it's advisory. It's not advisory. They say that... Why is it advisory if they say, if a transgender individual comes to us, we have to let them know that we are going to use the pronouns of their biological sex. And they come to the Commission and they want to know, is that going to violate this act? And you haven't disavowed that it is, I take it. But you don't know the answer. No, I don't have an answer for the court. But I would indicate that the processes are there for them to get that answer without bringing a federal lawsuit. So why aren't you willing to give... So they can bring their admin action. I agree with you. I found that useful to cite to the regulation that says you can seek a  But why not short-circuit that? Why can't you just give the declaration here? What's the difference between them saying, we want to know whether this pronoun usage will violate the act, and they file a suit, versus the same exact facts, and they put it in the admin complaint? I don't understand. Because the MDCR's process is not limited by Articles 3, case of controversy requirement. Because it's what? It's not limited by the Article 3, case of controversy requirement. There's a rule. They will look at the facts. They will apply it. There would be no standing argument. They're moving forward in a forum that's willing to entertain that hypothetical or proposed facts. Why is it? I mean, we have to take the pleadings as a given at the 12v6 stage. I don't understand why it's... If you're refusing to disavow, and you... I also don't understand the refusal to disavow, and the argument that it's not even arguably covered. So you make both arguments. You say it's not even arguably covered by the statute, but we refuse to disavow that it's covered by the statute. If it's not even arguably covered by the statute, how can you not possibly just disavow outright? It's not even arguably covered by the statute. So the first half of your brief, nowhere near the statute, it's not arguably covered. Second half, but we're not going to disavow enforcement. How are those two consistent? I think that goes to my earlier point, Your Honor, where we're discussing all of their actions are not going to be exempted. Some are and some aren't. So their complaint contains way more than just pronouns. So they would be asking the MDCR to rule on 50 different scenarios. The declaratory ruling provision of the Michigan administrative rules, it requires them to put forth a particular set of facts and the law that they're relying on so the commission can make that decision. It's not this broad, we want to be able to do everything we want without being challenged. I kind of compare it to, like, judicial immunity. We represent some judicial clients, and they have absolute immunity from suit. But that doesn't mean a complaint can't be filed in court. We defend them, we assert their immunity, and then the case is dismissed. I don't think that that should be any different for a religious entity who's claiming an exemption. A complaint may get filed, it might be administrative, it might be in a court of law, but either way, they can move to dismiss based on their religious freedoms. So they can get... So you've just admitted that there's a chance that a complaint is going to get filed. If I view the complaint itself as an Article III injury, you're talking about the merits, I agree with you, there will be serious questions about the scope of their arguments on the merits. But just the mere fact that a complaint might get filed, I would think is historically enough to show an Article III case. With the administrative process, it's not like a lawsuit. So the complaint comes in, so maybe the process with the commission will help a little bit. So the complaint comes in from an individual. Then someone at the Michigan Department of Civil Rights does an intake. So they look at it. Is it past the statute of limitations? Is there an exemption applies? Is there some other reason we should not look at this case? It could not even survive intake if one of those things is applicable. If they can't make a determination at the beginning, they conduct an investigation. That's just where they ask the respondent for a position statement, what is your position on this case? And then after they do discovery, then they file a charge. I would propose to the court that at the point at which they would obtain standing from an administrative case is once the charge is filed. Because many cases don't even make it past the initial filing. Isn't there a distinction in parties? The public may file a complaint, but this lawsuit is against Michigan. This is against the state. So the question is your enforcement as opposed to, or is that not correct, that if you have a statute where anybody in the public can file a complaint, does that automatically give the other side, for example, standing to sue even though they're suing you as an entity, not the person who's bringing a complaint that might or might not succeed? You're correct. To file an administrative complaint, it's a citizen who's been injured under the Elliot Larson Civil Rights Act. So they file a complaint. The MDCR is like the fact-finding body. They haven't initiated any complaints of their own against a religious entity on any of the issues that we have before this court. And if a citizen is filing a complaint, because also they give you two processes. You can follow the administrative process or you can go into a court of law and sue. And that's for an injured party also. The Michigan Department of Civil Rights doesn't file lawsuits against employers or religious entities or anyone else in a court of law. They follow the administrative process. So we have no control over someone with a filing fee and a complaint filing a complaint against. How does the admin process work? So they file a complaint with the commission. They have to file a complaint within 180 days. The commission then reviews the complaint to see if it's timely and it's justiciable under the Elliot Larson Civil Rights Act. Sometimes they have people complaining of other laws that they don't enforce and they will not pursue that. The next thing they do is they ask the respondent for a position statement. It's like this is the complaint against you. Here's what they allege. Please provide us with a statement of your side of the story. At that point, they can either resolve the case based upon the information they received from the complainant or in the respondent, or they can do discovery. They can send interrogatories. They can request production of documents. When they've gathered all their information, they look to find out is there sufficient evidence that a violation has occurred. If they find sufficient evidence, they file a charge. And that then removes the case to go to a hearing before the Michigan Office of Administrative Hearing and Rules. When does the court ever come into play? No, the court is a separate process. Sometimes they'll file a complaint in a court while an administrative charge is pending. The commission will dismiss that. What's the commission's coercive power? Assume the commission finds a violation. Does it have the authority to impose fines? Yes. It has the ability to order them to take certain action to correct the discrimination. There's fines involved. There's damages, too. When does Younger kick in? Has the commission thought about if a party filed a complaint and then the defendant in that complaint immediately ran to federal court? As you suggested, that might be the triggering event for Article III standing. Would the commission then say that under the principles of Younger that you can't enjoin an ongoing proceeding? Would that new suit be Younger barred? It depends on the circumstances. There are situations where we've had an administrative proceeding where there's been a lawsuit filed at the same time, for example, in the Studio 8 case. So a complaint was pending in the Studio 8 case, and then they filed in the Court of Claims, indicating that the offer was unconstitutional. At that point, because we couldn't get any more discovery, we tried to go to circuit court to get discovery, and they stayed that case. So the administrative case was stayed until there was a ruling from the Court of Claims on that issue. But I would say it's circumstantial. Sometimes the department may just dismiss the administrative charge because the claimant themselves who is making the complaint has decided, I want to go to court. But I meant the defendant seeks to enjoin. So the defendant files in federal court, suppose. Has this happened where there's been a complaint filed against the defendant by a third party, a private citizen, and the defendant responds by saying this proceeding is unconstitutional? Under your view, I think you can see that the standing would kick in at that point. And then the defendant goes to federal court to enjoin this investigation. Does the commission have a view about whether the federal court proceeding itself would be barred by principles of so Younger is the case that says a federal court generally cannot enjoin a state prosecution, and it's been extended to the civil context, I believe. I'm just curious, because I think you kind of put them between a rock and a hard place if you say they don't have standing until this complaint. But then when the complaint gets filed, then they can't file in suit either because of principles of Younger. I think they could file a federal suit. I think then they would have standing. I mean, if we're talking about the standing issue, because then they have a case in controversy. We have a specific complainant. We have a specific set of facts. We have the information that was given to the commission. And then that would be introduced in the federal court as an actual case in controversy, which is what we don't have here. We don't have anything similar to that. Counsel, I'm a little confused about the state's position. Are you saying that there have been no complaints brought against any religious entities for positions that have been taken that implicate these rules? I'm unaware of any charges that have been filed. They haven't identified any. I haven't obtained any from the commission to meet that circumstance. I will indicate, just so it's clear to the court, the distinction I'm making. There were complaints filed against a couple of entities. So, for example, a mouse health that the appellants brought up. It never survived intake. The complainant has to notarize a complaint before the agency will take it. They never came in and notarized it. That case was dismissed. Studio 8, which was filed, is going to a hearing. But Studio 8 is a little different. We have an individual who posted on her business Facebook page that if you do not identify as a man or a woman, you can go to a dog groomer. She didn't indicate it was based on her religious freedoms. All she said was, I have the right to say what I want. So they sent her the complaint. They asked her to give a position statement. She didn't. So still no assertion of any constitutional protected free speech or religious freedoms from her. And then they filed a lawsuit in the court of claims. So that case is still pending. And the court of claims case was dismissed because they didn't have jurisdiction. So there are complaints that were filed, but nothing has gotten to a charge phase regarding a religious entity who is engaged in the type of conduct that is alleged in this case. I see my time is up. But if anyone has any questions. Thank you. Thank you, Your Honors. Rebuttal. Your Honors, even now, Michigan refuses to disavow enforcement against Christian health care. Michigan said that there are some activities that Christian health care wants to engage in that violate LCRA and some that aren't. But disavow, as this court said in Kentucky v. Yellen, requires a specific type of disavow, not just a concession that there may be some things that Christian health care wants to do that violates the law. Under Michigan's theory, there's no appropriate time to bring a pre-enforcement action. If it's brought prior to an investigation, it's too early. If it's brought after an investigation, once a charge of discrimination is filed, then abstention doctrines kicked in, as you mentioned, Judge Murphy. And even at the investigatory stage, Michigan could take the same position that it hasn't reached a final position and would potentially bar pre-enforcement action. I do find compelling the State's point that, at least in the employment context, it might be position by position. And I take it your pleading suggests every position needs to abide by your principles. If it's fact-bound, that suggests that this complaint contains potentially 1,000 claims. We have to go through every employee, ask if, I don't know, you'll have various theories for why it should apply, but that does seem a bit of an advisory opinion feel if you're asking the court to do something like that. Well, Your Honor, Michigan said that it needs law and facts to make a determination. Here we've been litigating this case for two years and have a 70-page complaint. To your specific point, though, about the employment positions, in the complaint, pages 16 through 25, we've detailed every single position that we seek an exemption for under the First Amendment. We've also attached job descriptions to the complaint as exhibits with specific descriptions. We've also stated in our complaint that it's important for every employee to agree with Christian Health Care's religious beliefs because there's daily prayers, monthly prayers and devotions and worship time, and also quarterly prayers, Bible studies and devotion time. We've also included the specific policies that it has, and the declarations of Mark Blocker, who's the CEO, and Dr. Wu, who's the Chief Medical Officer, have specifically explained why each position is necessary. And so we've done all that Michigan has asked us to do, which is to provide sufficient information for it to make a decision. And if you look at the actual BFOQs that Michigan has granted in the past, those facts there are comparatively sparse to what we've included here. Those BFOQs appear on page 967 to 1000. Your position is that you don't have to ask and you don't have to request a declaratory injunction, right? I mean, a declaratory decision. That's correct, Your Honor. It's not required for plaintiffs to ask for permission to do what it has a constitutional right to do. And, in fact, Judge Grange... Well, tell me then, walk through the... Let's assume we all agree, which we do, that this is a claim that is arguably affected by a constitutional issue. It certainly is. And let's assume that it's arguably prescribed by the statute. What is it that places you in the category of having received a credible threat of enforcement? Yes, Your Honor. I would go back to the McKay factors. In Kareem, for example, the individual wanted to post a ballot selfie photo. And Kareem applied McKay and said that... I'm asking you about your case. Right. About your case. What is it that... Where is the history of past enforcement as to your plaintiffs? Or enforcement warning letters as to your plaintiffs? And that's even before we get to the disavowal issues. What is the background of enforcement against your plaintiffs? Right. Well, that's one of the McKay factors. And this Court has consistently said that they're contextualized. And the Supreme Court and this Court have often held that a plaintiff has pre-enforcement standing even before a log takes effect. But the specific history that we're relying on is the thousands of complaints that Michigan has received and investigated, including 73 complaints against sexual orientation and gender identity just in 2018 alone. So that means that anyone who wants to come before this Court and claim standing merely looks at the statistical background of this commission and whether they have sought to enforce the entirety of ELCRA. And then that gives them standing. Not quite, Your Honor. It depends. I mean, the statistics are clearly evidence of a desire to enforce the law. The fact that Michigan has regularly enforced its law shows that it has a desire to enforce it. Yes, but the question is, has it enforced it as to you and your activities? Because otherwise, that podium becomes an opportunity for anyone to cite the statistics of what Michigan has done and say, we have standing, they've enforced this act, we're done here. But I don't see the McKay factors or the law that the Sixth Circuit has followed throughout its own development of standing law granting that broad opening to anyone who wants to say, this interferes with my right, and they agree that it is an issue touched by constitutional rights, then because they enforce ELCRA, statistically speaking, you and everybody else have standing. Counsel, that can't be the case for what it takes to have standing before this Court. Can it? Your Honor, I have at least a couple of responses to that, if I may. The first one is that the history of enforcement is one of the factors the Court looks at. And so obviously, if a plaintiff comes in and alleges conduct that has nothing to do with the statute, the government can disavow. But second, as I was saying with Kareem, there is no history of enforcement against that particular plaintiff, but she still had standing. And Kareem applied the McKay factors. Kareem specifically said that a history of enforcement is not necessary to establish standing, and that's because McKay is a contextualized approach to credible threat, of which active enforcement of the law is at least one of the factors. Neighbors, for example, a case that happened since McKay, there was zero history of enforcement against anyone, but the Court still found that the plaintiffs there had standing. Green Party of Tennessee is another situation where the plaintiffs had standing, even though the law had never been enforced against the particular plaintiffs and had never been enforced against any other comparable party. I guess I struggle a little bit with Green Party and several of them because they are contextualized to their own cases. Green was really disavowal alone is insufficient, right? It wasn't the lesson of that case. But it doesn't tell me or I don't understand it to say that the doors are wide open on standing. Give me your best short analysis of why your client is the recipient of a credible threat of enforcement. I'd say two things. First is that a specific threat directed at a specific plaintiff is not what the Supreme Court of this Court requires. Second, under Kareem, which again applied the McKay factors, said that the government's public proclamations of its general desire to enforce the law are sufficient to satisfy that prong of McKay. Here, since 2018, Michigan has been adamant that its law applies to sexual orientation and gender identity discrimination and it has specifically objected to religious exemptions. And I'll just give one more example, if I may. Commissioner Londo, who's one of the commissioners on the Civil Rights Committee, testified in support of the amendments to ELCRA and he advocated for the position, quote, it should be illegal to discriminate against someone on the basis of sexual orientation or gender identity, even if it conflicts with their religious beliefs. What I'm struggling with is now you're giving me information about the passage of the act itself, kind of legislative history, but that's not about your client. And if that is the standard, anyone has standing. Isn't that the case? How could they not have standing under this argument? Well, of course, the government could always disavow. The government could say that the law has not been regularly enforced. The government could say that the party is not regulated by the statute. But none of that is the case here. And in Holder v. Humanitarian Law Project, another case that's very helpful to us because it's an ad as applied pre-enforcement challenge alleging a First Amendment situation, that the Supreme Court then went on to address strict scrutiny. In that case, as I recall, there's no history of enforcing the law against the particular plaintiffs. It was sufficient that they came to court challenging a very broad law that broadly prohibited providing material support to terrorism. The plaintiffs made allegations in the complaint to justify their First Amendment injury. The court said that they had standing because the government refused to disavow and had previously prosecuted several other organizations under the law. And, in fact, it's cited to page 5 of the United States brief in that case. And if you look at page 5 of that brief, the situations of prior enforcement involved things like television satellite and providing martial arts training, which were totally unlike the types of political advocacy training the plaintiffs in Holder v. Humanitarian Law Project wanted to provide. Thank you. Thank you, Your Honor. We appreciate your briefing and your argument. It's been very helpful to us in a case that's pretty difficult. So your case will be taken under advisement and an opinion will be rendered in due course and you may call the next case.